IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 25, 2015

**STATE OF TENNESSEE v. FREDERICK ANDERSON**

**Appeal from the Criminal Court for Hamilton County**
**No. 280227    Barry A. Steelman, Judge**

**No. E2014-00661-CCA-R3-CD-FILED-JUNE 29, 2015**

The Defendant, Frederick Anderson, was convicted of two counts of especially aggravated kidnapping; three counts of aggravated robbery; one count of aggravated burglary; two counts of employing a firearm during the commission of a dangerous felony; and one count of possession of a firearm with the intent to go armed during the commission of a dangerous felony. He received an effective sentence of sixty years' incarceration. The Defendant raises the following issues on appeal: (1) whether the trial judge should have recused himself from the Defendant's sentencing; (2) whether the trial court erred in failing to instruct the jury on the charge of especially aggravated kidnapping as mandated by State v. White, 362 S.W.3d 559 (Tenn. 2012); (3) whether the trial court erred by not merging the Defendant's convictions for aggravated robbery, especially aggravated kidnapping, and employment of a firearm during the commission of a dangerous offense; (4) whether the trial court erred in permitting the State to introduce excerpts of the jailhouse phone calls between the Defendant and his wife; (5) whether the trial court erred in sentencing the Defendant to an effective sixty years' incarceration; and (6) whether the cumulative effect of the errors deprived the Defendant of a fair trial. After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, J., joined. NORMA MCGEE OGLE, J., filed a separate concurring opinion.

Donna Miller (at sentencing and on appeal); Ardena J. Garth, District Public Defender; and Mary Ann Green and Sheretta Smith, Assistant District Public Defenders (at trial), Chattanooga, Tennessee, for the appellant, Frederick Anderson.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Neal Pinkston, District Attorney General; and Bret Alexander and Lance Pope, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual and Procedural Background**

Initially, the Defendant was indicted in case number 277381 with fourteen counts[1] in connection with a home invasion at the residence of Kim Schmitt on June 22, 2010.  In May 2011, the grand jury issued a superceding indictment, case number 280227, charging the Defendant with the following offenses:

| Count | Charge | Victim |
|:-----:|:-------|:------:|
| 1 | Especially Aggravated Kidnapping | L.S. |
| 2 | Employment of a Firearm During the Commission of a Dangerous Felony, to-wit: Especially Aggravated Kidnapping | L.S. |
| 3 | Especially Aggravated Kidnapping | J.S. |
| 4 | Employment of a Firearm During the Commission of a Dangerous Felony, to-wit: Especially Aggravated Kidnapping | J.S. |
| 5 | Aggravated Burglary | Kim Schmitt |
| 6 | Employment of a Firearm During the Commission of a Dangerous Felony, to-wit: Aggravated Burglary | Kim Schmitt |
| 7 | Aggravated Robbery | Kim Schmitt |
| 8 | Aggravated Robbery | Amanda Schmitt |
| 9 | Aggravated Robbery | J.S. |

---

[1] The original indictment is not included in the record on appeal.

*The First Ex Parte Hearing*

The day before trial, the trial court held an in-chambers, ex parte hearing at the request of defense counsel ("the first ex parte hearing"). Defense counsel reported that the Defendant's wife, Stephanie Anderson, had intended to voluntarily come to the trial to testify during the Defendant's case-in-chief. According to defense counsel, Mrs. Anderson's testimony was material to the defense. However, defense counsel was concerned that Mrs. Anderson would no longer be available for trial. Defense counsel explained that Mrs. Anderson lived in New Mexico and that she had purchased a non-refundable plane ticket in order to travel to Tennessee for the original trial date. However, because the trial had been continued for two weeks, Mrs. Anderson's finances would not allow her to buy another plane ticket without reimbursement of her travel expenses. Additionally, defense counsel had learned that Mrs. Anderson had "moved on in her life" since the Defendant's arrest. Defense counsel explained that Mrs. Anderson had not previously been subpoenaed because defense counsel believed that she would appear voluntarily. Defense counsel asked that the court issue a subpoena for an out-of-state witness to compel Mrs. Anderson's attendance and to allow for her travel expenses to be reimbursed.

Defense counsel telephoned Mrs. Anderson, and the trial court questioned her on speaker phone without objection from defense counsel. Mrs. Anderson told the court that she lived in New Mexico and was employed at a home health care agency. She was married to the Defendant, and no separation or divorce paperwork had been filed to terminate their relationship. Mrs. Anderson explained that she had planned to voluntarily testify at trial and that she had purchased a non-refundable plane ticket to travel to Tennessee. However, because the trial date had been changed, Mrs. Anderson could not afford to purchase another plane ticket or a hotel room. Following the hearing, the trial court issued the subpoena for an out-of-state witness to allow for reimbursement of Mrs. Anderson's travel expenses.

*Trial*

The charged offenses took place on June 22, 2010, at Kim Schmitt's home on 13th Avenue in Chattanooga. At the time, Kim, Kim's mother Dorothy Melton, and Kim's eleven-year-old twins, J.S. and L.S., all lived in the home.[2] Kim's eighteen-year-old

---

[2] Many of the victims in this case share a common surname. Therefore, in order to avoid confusion, we will refer to them by their first names in this opinion. We intend no disrespect. Additionally, the victims' surname is spelled various ways throughout the record. Because the indictment spells their name as "Schmitt," we will use this spelling in this opinion. To protect the anonymity of the minor victims, we will refer to them by their initials.

daughter, Amanda, was visiting the home. Melanie Woods,[3] Brian Woods, Sr., and their son B.W. ("the Woods family") also lived in the home. Both Kim and Ms. Melton suffered from serious health problems; Ms. Melton was bedridden, and Kim required oxygen at all times. Mrs. Woods served as their caretaker and helped with the children.

On the evening of June 22, 2010, Ms. Melton was in her room at the back of the house. Kim and Amanda were in Kim's bedroom playing a computer game; Kim was sitting at her desk, and Amanda was sitting on the bed. L.S. and B.W. were in the living room. J.S. was in his room playing a video game. Mr. Woods was sitting outside on the front porch. Mrs. Woods was moving back and forth between Kim and Ms. Melton's bedrooms.

A few minutes before 10:00 p.m., the Defendant and another black male entered the residence without the permission of anyone who lived there. As Mrs. Woods walked through the kitchen on her way to Kim's room, she saw the Defendant standing between the stove and the refrigerator. Before she could ask him who he was or what he was doing there, the Defendant said, "Bitch, don't f***ing look at me." Mrs. Woods immediately looked at the floor. The Defendant hit her on the back of the head with a gun. He then started shoving Mrs. Woods toward Kim's bedroom door.

Sitting in her room, Kim heard a commotion going on in another part of the house. She stood up to close the door to her bedroom, and she saw Mrs. Woods walking down the hallway followed by the Defendant. Kim closed the door to her bedroom but remembered that L.S. was in another part of the house, so she opened her door to try to prevent the Defendant from becoming angry. When she opened the door, the Defendant came into her room with a gun and shoved her into her desk chair, pointing the gun at her head. At the time, Kim had her three chihuahuas in her room, and they started "raising Cain." The Defendant told Kim, "You better get your [f]'ing dogs before I kill them . . . You better get them right now." Kim responded, "Okay. I'm trying. I'm trying." Kim's oxygen device had been "yanked" off of her face during the altercation. She was scared and could not breathe, but, nevertheless, she tried to calm the dogs.

Kim and the Defendant continued to yell and scream at each other. The Defendant repeatedly said, "B****, don't look at me," and "Give me the money." Kim was screaming, crying, and telling the Defendant, "Don't hurt anyone." During the altercation, the Defendant "pistol-whipped" Kim on the side of her head, cutting her right ear and causing it to bleed.

---

[3] Melanie Woods is the wife of Brian Woods, Sr. At times in the record, she is identified as Melanie Yarborough. For the sake of clarity, we will refer to her as Melanie Woods in this opinion.

At some point after the Defendant entered Kim's bedroom, Amanda unsuccessfully tried to call 911 from her cell phone. While Amanda was dialing, the Defendant demanded that Amanda give him the phone, reached over Kim's bed, and hit Amanda on the head with his gun. Amanda refused to give the Defendant her phone, and the Defendant grabbed her by the ankles, pulled her off the bed, and began "stomping" on her neck and back. He then took the phone from Amanda and covered her with a sheet from the bed.

The Defendant turned his attentions back to Kim and continued to push her and "yank" her hair. Because Kim had lost her oxygen, she could not breathe and begged for her oxygen back. She also implored the Defendant not to hurt her children. The Defendant demanded that Kim give him money. Kim tried to hand him a small bag she used to store money, but the Defendant hit her again and caused the bag of money to fall to the floor. Kim tried to reach for the bag, but the Defendant continued to hit her.

While the Defendant was confronting Kim, J.S. opened the door to L.S.'s bedroom[4] and saw a man in a black shirt standing in the doorway of his mother's bedroom. He heard the man demand money. Scared, J.S. closed the door to L.S.'s room and locked it. He then walked back to his room to call 911. During his conversation with the 911 operator, the yelling emanating from Kim's bedroom stopped. J.S. returned to his sister's door and opened it. When he opened the door, the Defendant hit him on the head with a gun, and J.S. fell to the ground. J.S. dropped his phone when he fell, and he did not see his phone again for the rest of the night. The Defendant dragged J.S. into his mother's room where Amanda was lying on the floor. J.S. remained lying on the floor of his mother's room, as instructed by the Defendant, while the Defendant went to another part of the house.

Eventually, the Defendant came back into Kim's bedroom and made her walk to the bathroom. He then shut Kim in the bathroom. Next, the Defendant ordered Amanda and J.S. to go into the bathroom with Kim. The Defendant instructed them to stay inside the bathroom and closed the door behind him.

Even though J.S. dropped his cell phone, the 911 connection remained opened. The recording of the 911 call indicates that the Defendant took possession of J.S.'s cell phone and carried it with him for the duration of the offense and as he fled the scene. In the recording, the Defendant can be heard forcing Kim into the bathroom. As the Defendant was forcing Kim into the bathroom, Kim asked for oxygen, and the Defendant responded by telling Kim

___

[4] Through their testimony, members of the Schmitt family explained that, in order to access J.S.'s bedroom, one had to walk through L.S.'s bedroom. Therefore, although J.S. was in his own room when the Defendant entered the residence, he had to walk through L.S.'s room to observe what was happening in other parts of the home.

to sit down in the bathroom. The recording also includes an exchange between the Defendant and Ms. Melton in Ms. Melton's bedroom. After that exchange, the Defendant can be heard forcing Amanda and J.S. into the bathroom. Shortly thereafter, the Defendant can be heard running from the scene.

While the Defendant was arguing with Kim and Amanda in Kim's bedroom, Mrs. Woods had been pushed back into the living room by the Defendant. A second man stood in the living room, holding a gun. L.S., B.W., and Mr. Woods were lying on the floor of the living room. The second man instructed Mrs. Woods to lie on the floor as well, and she complied. After a few minutes, the second man told Mrs. Woods to get up and handed her a roll of duct tape. He instructed her to duct tape her husband's hands together, and she complied.

While she was duct taping Mr. Woods's hands, Mrs. Woods heard a knock on the front door of the home. The second man answered the door and found two women, later identified as Nancy Gann and Betty Palmer, standing on the front porch. The second man pulled the women in and forced them to lie down on the floor. Mrs. Woods continued to duct tape her husband's hands as instructed, but the duct tape began to tear into uneven, narrow strips. After duct taping Mr. Woods, Mrs. Woods was instructed to duct tape the hands of L.S., B.W., Ms. Gann, and Ms. Palmer.

After she had duct taped everyone in the living room, the second man ordered Mrs. Woods to get down on her knees. Mrs. Woods believed the second man intended to duct tape her, but then she heard the Defendant say, "Is everything all right, Big Dog? Big Dog, you ready, Big Dog?" Mrs. Woods was told to stand up and was pushed into the bathroom with Kim, Amanda, and J.S.

They stayed in the bathroom for a few minutes until they believed the intruders had left. When they opened the bathroom door, Amanda observed the Defendant outside, standing in the road as if he was trying to decide which way to run. Amanda then lost consciousness in the hallway. L.S. was still duct taped in the living room, crying.

Police and ambulance personnel responded within minutes. As police arrived, they observed two men running from Kim's home. Officers gave chase and saw one of the suspects discard bags that he had been carrying and then cut through a nearby yard and out of the officers' sight. Police set up a perimeter and began searching for the suspects.

The Defendant was found hiding in a small "shack" behind one of the houses in Kim's neighborhood. J.S.'s cell phone, Amanda's cell phone, a black t-shirt, and a roll of duct tape were found in the shack with the Defendant. Forensic testing later matched the strips of tape

used to bind the victims to the roll of duct tape found in the shack.  A pistol, a pouch containing money, and a small bag containing Kim and Ms. Melton's medications were found in the road where police observed one of the suspects discard bags during the chase. These items were returned to the Schmitt residence.

*Mrs. Anderson's Trial Testimony*

At trial, Mrs. Anderson testified that she met the Defendant when they both lived in Atlanta, Georgia.  They were married in 2007 and moved to Oak Ridge in 2008.  In the summer of 2008, they decided to return to Atlanta but could not find housing, so they settled in Chattanooga.  Eventually, Mrs. Anderson became pregnant with their youngest son, and in June or July of 2009, they moved to Atlanta so that the Defendant could work with his father's landscaping company.

On June 22, 2010, Mrs. Anderson, the Defendant, and their youngest son were traveling from their home in Atlanta to Oak Ridge to visit Mrs. Anderson's mother and oldest son.[5]  Mrs. Anderson planned to pick up birthday presents and a cake for her youngest son's birthday in Oak Ridge.  On the way to Oak Ridge, they stopped in Chattanooga in order to pick up a tax form from the Defendant's former employer, Popeye's Chicken.  However, they were unable to get the form.  The Defendant and Mrs. Anderson stayed in Chattanooga and visited with old friends for most of the afternoon.  Around 7:30 p.m., Mrs. Anderson left the Defendant at a Wendy's near Kim's home and drove to Oak Ridge.  The Defendant had planned to meet one of his acquaintances, Tiwon Billups, while Mrs. Anderson was in Oak Ridge.  According to Mrs. Anderson, Mr. Billups lived next door to the Schmitt residence. Mrs. Anderson left Oak Ridge to return to Chattanooga around 9:00 p.m.  When Mrs. Anderson arrived at Mr. Billups' home to pick up the Defendant, she saw police surrounding the area.

Mrs. Anderson recalled that the Defendant was wearing a black t-shirt and blue cotton pants before he was arrested. He was also wearing a sleeveless white undershirt, black shoes, and an Atlanta Braves hat.  Mrs. Anderson confirmed that she and the Defendant were still married and that she still loved him.  She stated that she would not lie for her husband.

*Introduction of Jailhouse Phone Calls*

At the beginning of the seventh day of the nine-day trial, before Mrs. Anderson testified, the State informed both the trial court and the Defendant that they intended to introduce recordings of phone calls the Defendant made to Mrs. Anderson from the jail (the

---

[5] Mrs. Anderson's oldest son was staying with his grandmother in Oak Ridge for part of the summer.

"jailhouse phone calls") for the purpose of impeaching the Defendant if he chose to testify. Immediately before coming to court that day, the State had requested and received CD copies of over 300 jailhouse phone calls, and it had provided copies of the same to the Defendant along with a call log. The recordings captured a year and a half of the Defendant's phone calls—from the date of his arrest until the date the State requested the recordings. The Defendant's attorneys objected on the basis that they could not properly advise the Defendant about his right to testify without listening to the phone calls. After Mrs. Anderson completed her testimony, the trial court recessed until 9:00 the following morning to allow the Defendant to listen to the jailhouse phone calls.

The following morning, the Defendant introduced for identification the CDs containing the jailhouse phone calls and attached call log. In total, the CDs contained 680 of the Defendant's phone calls. The Defendant argued that his attorneys' office simply did not have enough staff to listen to all 680 phone calls in one night and asked that the trial court exclude the recordings on various grounds. The trial court ruled that any of the phone calls the Defendant made after the trial started could be introduced to impeach the Defendant's testimony if they were otherwise admissible under the rules of evidence.

The Defendant asked the State to identify which calls were made during the trial. He noted that the calls were "scrambled" on the CDs and it was difficult to determine which recordings were made after the trial began. The State responded that its CDs were in the same format as the Defendant's. The trial court denied the request and noted that the Defendant "kn[ew] what he said better than anybody else." Ultimately, the Defendant chose not to testify. He explained that he had made the decision not to testify when the State rested its case-in-chief—before the State sought to introduce the jailhouse phone calls.

The State then requested the jailhouse phone calls be introduced as rebuttal proof to impeach Mrs. Anderson's testimony. The Defendant objected, arguing that the State should have introduced the phone calls during its case-in-chief. The State argued that the phone calls could not have been introduced during its case-in-chief and that the jailhouse phone calls showed that Mrs. Anderson's testimony was based on a concocted story, which she discussed with the Defendant over the phone. The jailhouse phone calls would contradict Mrs. Anderson's testimony and show that it was fabricated.

The trial court listened to the five jailhouse phone calls the State sought to introduce. In those recordings, the Defendant and Mrs. Anderson discussed her testimony, the time line of their movements on the day of the offense, and what the Defendant was wearing on the day of the offense. At several points during the conversations, the Defendant and Mrs. Anderson challenged each other's recollections of their movements on the day of the offense. Mrs. Anderson stated that the Defendant was wearing a striped shirt on the day of the

offense, but the Defendant told her he was wearing a black shirt. The Defendant also told Mrs. Anderson about another witness's testimony, even though the rule of sequestration had been invoked at the beginning of trial. Finally, the Defendant informed Mrs. Anderson that he told the court that there had been a "rift" in their marriage so that Mrs. Anderson would be reimbursed for travel expenses. Mrs. Anderson indicated there was no "rift" in the marriage. Mrs. Anderson denied knowing Mr. Billups, but she also told the Defendant that Mr. Billups was "a little b****."

The trial court held that the jailhouse phone calls directly replied to, explained, and perhaps contradicted, Mrs. Anderson's testimony. Further, the trial court concluded that the phone calls would allow for the jury to fairly assess Mrs. Anderson's credibility and weigh her testimony. Therefore, the recordings were admitted as rebuttal evidence.

The jury found the Defendant guilty as charged on all counts, except Count 2. For Count 2, the jury found the Defendant guilty of the lesser included offense of possession of a firearm with the intent to go armed during the commission of a dangerous offense, to-wit: the especially aggravated kidnapping of L.S.

*Defense Counsel's Motion to Withdraw*

After trial, but before sentencing, defense counsel filed a motion to withdraw. In that motion, defense counsel explained that the Defendant had misrepresented the status of his marriage to his attorneys. The trial court conducted another in-chambers, ex parte hearing on the motion to withdraw ("the second ex parte hearing"). In that hearing, defense counsel explained that Mrs. Anderson was initially very helpful and seemed to be a willing witness. However, as the trial approached, Mrs. Anderson became harder to reach, and defense counsel was concerned that she may have begun a relationship with another man. The Defendant also told defense counsel that there was a "rift" in his marriage to Mrs. Anderson and that Mrs. Anderson had a new boyfriend. Defense counsel reported this information to the court during the first ex parte hearing in order to secure funds to allow Mrs. Anderson to come to Tennessee to testify. However, after the jailhouse phone calls were played during the trial, it became evident that there was no rift in the Defendant's marriage, and defense counsel felt that a fraud had been perpetrated on the court. Additionally, defense counsel suggested that the trial judge recuse himself from the remainder of the proceedings "because a fraud was perpetrated on [the court]."

The trial court recalled that Mrs. Anderson indicated in the first ex parte hearing that her finances would not allow her to travel to Tennessee; she never indicated there were problems in her marriage to the Defendant. The trial court granted defense counsel's motion to withdraw. Subsequently, new counsel was appointed to represent the Defendant.

*Motion to Recuse*

On the day the Defendant's sentencing hearing was scheduled, the Defendant filed a "Motion to Recuse or Disqualify Judge" ("Motion to Recuse") alleging, among other things, that the trial judge's impartiality could reasonably be questioned based on the information the trial judge learned during the first ex parte hearing. The Defendant requested that the judge recuse himself so as to avoid the appearance of impropriety.

At the hearing on the Motion to Recuse, the Defendant claimed that it was inappropriate for the trial court to directly question Mrs. Anderson during the first ex parte hearing. The Defendant also argued that representations made by one of the Defendant's trial attorneys during the second ex parte hearing on the Motion to Withdraw would cause the trial court to feel bias against the Defendant.

Defense counsel testified that she was counsel of record for the Defendant's trial and that she requested the first ex parte hearing in order to secure Mrs. Anderson's presence as a witness at trial through a subpoena for an out-of-state witness. She recalled that Mrs. Anderson revealed more information during the ex parte hearing than what she ultimately testified to during trial. However, at another point in her testimony, defense counsel recalled that Mrs. Anderson's trial testimony was consistent with what Mrs. Anderson told the judge during the first ex parte hearing.

Defense counsel recalled that, during the second ex parte hearing, she suggested that the trial judge should recuse himself for having obtained information directly from Mrs. Anderson. She claimed that, in light of the first ex parte hearing where the judge questioned Mrs. Anderson, Mrs. Anderson's trial testimony, and the introduction of the jailhouse phone calls, the trial judge was placed "in a unique position of having more information than what was testified to or was on the recordings" because the recordings were inconsistent with what Mrs. Anderson told the judge during the first ex parte hearing. In this case, defense counsel believed that the trial judge's communication with Mrs. Anderson coupled with the information revealed by the Defendant's jailhouse phone conversations with Mrs. Anderson created an appearance of impropriety.

Defense counsel stated that she was angered and upset when she heard the Defendant's jailhouse phone calls and that they caused her to have a bias against the Defendant. Consequently, she felt that she could no longer represent the Defendant. She was concerned that the judge may harbor a similar bias against the Defendant or at least there would be an appearance of impropriety.

In a detailed written order, the trial court denied the Defendant's Motion to Recuse. The court noted that the trial had been continued twice—once at the request of the Defendant and once due to the Defendant's late-filed request to secure the services of an expert witness. Then, the day before trial was scheduled to begin, defense counsel filed an ex parte request for a subpoena to compel Mrs. Anderson to attend the trial. The trial court noted that it was the Defendant, through his attorneys, who informed the court that he and his wife were estranged during the first ex parte hearing. Mrs. Anderson never indicated that she was estranged from the Defendant. Later, in the jailhouse phone calls between the Defendant and Mrs. Anderson that were introduced at trial, the court heard the Defendant instruct Mrs. Anderson to say that there had been a rift in their marriage in order to get reimbursement for her travel expenses. In short, "The [trial court] did not learn anything from the [first ex parte hearing] conversation with [Mrs. Anderson] except that the pretrial representation of counsel regarding the status of the marriage ie: estrangement was not correct and that the pretrial representation by counsel of the witness'[s] inability to pay her travel expenses was apparently correct." Additionally, the court noted that any knowledge it had about these issues came from official court proceedings and therefore did not constitute a basis for recusal. The trial court held that the ex parte hearings did not establish an appearance of impropriety and denied the Defendant's Motion to Recuse.

*Sentencing Hearing*

Officer Bryan Johnson of the Chattanooga Office of Probation and Parole testified that he prepared the presentence report for the Defendant's sentencing hearing. When Officer Johnson attempted to interview the Defendant, the Defendant refused to give a statement but provided a written refusal, stating, "I already feel I have not gotten a fair trial, and this is nonsense, thus refusing this ridiculous procedure and I want my fair trail [sic], thus refusing this interview."

Because the Defendant refused to be interviewed for the presentence report, Officer Johnson was only able to confirm a portion of the Defendant's criminal history. On August 19, 2009, the Defendant was given a ten-year suspended sentence for a forgery conviction in DeKalb County, Georgia. The first year of that sentence was ordered to be served on intensive probation. At the time of the offense in this case, the Defendant had been on intensive probation for approximately ten months. Officer Johnson also received certified copies of eight of the Defendant's prior convictions from counties in Georgia and Texas, ranging in dates from 1986 to 2009. Additionally, the Defendant's probation had been revoked on two prior occasions, and he had a revocation of probation pending in Georgia for his 2009 forgery conviction.

The Defendant refused to concede that he was the person convicted in the prior offenses listed in the presentence report. In response, the State's investigator testified that she confirmed that the prior convictions were the Defendant's by comparing the date of birth and Social Security numbers listed on the prior convictions with those of the Defendant. The Court found that the State had sufficiently proven that the Defendant was the individual convicted for the prior offenses.

The State argued that the facts of the case, the vulnerability of the victims, and the Defendant's attempt to manipulate the judicial process by instructing Mrs. Anderson on her testimony justified an effective sentence of sixty years. The Defendant maintained his innocence and argued that any sentence above the minimum would be an effective "death sentence" because the Defendant was already forty-six years old. Additionally, the Defendant noted that none of the victims were killed during the offense and he did not have a history of violent offenses. Consequently, any sentence above the minimum would not be necessary to achieve the purposes and principles of sentencing.

The trial court explicitly noted the purposes and principals of sentencing. The trial court considered the enhancement and mitigating factors and found that the following enhancement factors applied to the felony convictions in this case: (1) the Defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (8) the Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; and (13) at the time the felony was committed, the Defendant was released on intensive probation. See Tenn. Code Ann. § 40-35-114(1), (8), (13) (2010). The trial court also found that the enhancement factors "grossly outweigh[ed]" the mitigating factor that there was no loss of life in this case.

The trial court then turned to the discretionary consecutive sentencing factors and found that the following factors applied: (2) the Defendant was an offender whose record of criminal activity was extensive; and (6) the Defendant is sentenced for an offense committed while on probation. See Tenn. Code Ann. § 40-35-115(2), (6) (2010). Additionally, the court noted that the sentences for the Defendant's convictions for employing a firearm during the commission of a dangerous felony were required by law to run consecutively to their accompanying felonies.

The trial court sentenced the Defendant as follows:

| Count | Conviction | Sentence; Range; and Release Eligibility |
|---|---|---|
| 1 | Especially Aggravated Kidnapping of L.S. (Class A Felony) | 30 years; Range II; 100% |
| 2 | Possession of a Firearm with Intent to Go Armed During the Commission of a Dangerous Offense, to-wit: Especially Aggravated Kidnapping of L.S. (Class C Misdemeanor) | 30 days in the Workhouse |
| 3 | Especially Aggravated Kidnapping of J.S. (Class A Felony) | 30 Years; Range II; 100% |
| 4 | Employment of a Firearm During the Commission of a Dangerous Felony, to-wit: Especially Aggravated Kidnapping of J.S. (Class C Felony) | 10 Years; Range III; 45% |
| 5 | Aggravated Burglary of Kim Schmitt (Class C Felony) | 15 years; Range III; 45% |
| 6 | Employment of a Firearm During the Commission of a Dangerous Felony, to-wit; Aggravated Burglary of Kim Schmitt (Class C Felony) | 15 Years; Range III; 45% |
| 7 | Aggravated Robbery of Kim Schmitt (Class B Felony) | 20 Years; Range II; 35% |
| 8 | Aggravated Robbery of Amanda Schmitt (Class B Felony) | 20 Years; Range II; 35% |
| 9 | Aggravated Robbery of J.S. (Class B Felony) | 20 Years; Range II; 35% |

Pursuant to mandatory consecutive sentencing laws, the trial court ordered Count 4 to be served consecutive to Count 3 and Count 6 to be ordered consecutive to Count 5. As to discretionary consecutive sentencing, the trial court ordered Counts 1 and 8 to run consecutive to Count 6. Consequently, the Defendant was given an effective sentence of sixty years' incarceration. Because the Defendant was on probation at the time of this

offense, the effective sixty-year sentence was ordered to be served consecutive to the ten-year sentence for the Defendant's prior forgery conviction in Georgia. The Defendant's subsequent Motion for New Trial was denied after a hearing. This timely appeal followed.

## II. Analysis

*Recusal*

The Defendant contends the trial judge was biased against him and that the trial judge's failure to recuse himself constitutes impropriety or at least an appearance of impropriety. The Defendant claims that "inconsistent testimony" in the form of the trial judge's conversation with Mrs. Anderson during the first ex parte hearing and the jailhouse phone calls introduced during trial caused the trial court to be biased against the Defendant. In support of this claim, the Defendant points to defense counsel's comments during the second ex parte hearing to illustrate that she was concerned the trial court believed she had participated in perpetrating a fraud on the court.

A trial judge should recuse him or herself whenever the judge "has any doubt as to his ability to preside impartially in a criminal case or whenever his impartiality can reasonably be questioned." Pannel v. State, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001) (citing State v. Hines, 919 S.W.2d 573, 578 (Tenn. 1995)). This is an objective standard. Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). Recusal is appropriate "when a person of ordinary prudence in the judge's position would find a reasonable basis for questioning the judge's impartiality." Id. The judge generally need not recuse him or herself if the bias or perceived bias is "based upon actual observance of witnesses and evidence during trial." Id. However, if the judge's bias is "so pervasive that it is sufficient to deny the litigant a fair trial, it need not be extrajudicial." Id. Whether to grant a motion to recuse rests within the discretion of the trial court, and this Court will not reverse the trial judge's decision absent an abuse of discretion. Hines, 919 S.W.2d at 578.

In this case, the Defendant argues that a reasonable person could perceive that the trial court developed a bias against the Defendant when he heard "inconsistent testimony" about the status of the Defendant's marriage to Mrs. Anderson. During the first ex parte hearing, defense counsel informed the court that Mrs. Anderson wanted to "move on in her life," causing defense counsel to believe she may not voluntarily appear to testify at trial. Conversely, when the jailhouse phone calls were introduced at trial, the trial court heard the Defendant inform Mrs. Anderson that he had told his defense attorneys there was a "rift" in their marriage in order to secure funds for her to travel to Tennessee. The Defendant points to comments made by defense counsel during the second ex parte hearing, which illustrate that she felt that a fraud had been perpetrated on the court because there was not a rift in the

Defendant's marriage, to show that a reasonable person would perceive the judge to have a similar bias against the Defendant.

When the trial judge spoke with Mrs. Anderson during the first ex parte hearing, Mrs. Anderson informed him that she had not filed any paperwork to terminate her marriage to the Defendant; instead, she did not believe her finances would allow to her travel from New Mexico to Tennessee to testify on the Defendant's behalf. Based upon Mrs. Anderson's representations, the trial court issued an out-of-state subpoena to allow Mrs. Anderson to be reimbursed for travel expenses.

In his order denying the Defendant's Motion to Recuse, the trial judge commented on his conversation with Mrs. Anderson, stating, "The Court did not learn anything from the conversation with [Mrs. Anderson] except that the pretrial representation of counsel regarding the status of the marriage ie: estrangement was not correct and that the pretrial representation by counsel of the witness'[s] inability to pay her travel expenses was apparently correct." Therefore, the Defendant's statements in the jailhouse phone calls were not inconsistent with what Mrs. Anderson told the trial judge during the first ex parte hearing. Additionally, nothing in the record indicates that the trial court issued the out-of-state subpoena based on the representations defense counsel made about the state of the Defendant's marriage. Consequently, even though defense counsel may have felt a fraud had been perpetrated on the court, it does not appear that the trial court shared that view. Moreover, any information the trial judge had regarding the state of the Defendant's marriage was gleaned from "actual observance of witnesses and evidence" during judicial proceedings. See Alley, 882 S.W.2d at 820. Therefore, we are unable to conclude that the trial court abused its discretion in denying the Motion to Recuse.

*Jury Instruction for Especially Aggravated Kidnapping*

The Defendant argues that his two especially aggravated kidnapping convictions must be reversed and remanded for a new trial because the jury in this case was not given a White instruction, and such error was not harmless beyond a reasonable doubt. First, we address the Defendant's dual convictions for the especially aggravated kidnapping and aggravated robbery of J.S. Second, we address whether White applies to the Defendant's convictions for especially aggravated kidnapping of J.S. and L.S. in conjunction with his convictions for the aggravated robberies of Kim and Amanda.

## a.  Dual Convictions for Especially Aggravated Kidnapping and Aggravated Robbery of J.S.

As charged in the superceding indictment, J.S. is the only individual who was the victim of both an especially aggravated kidnapping as well as an accompanying aggravated robbery.  Such fact scenario fits squarely within the purview of White.  See White, 362 S.W.3d at 562 (defendant convicted of both aggravated robbery and especially aggravated kidnapping of a single victim).

In Tennessee, the offense of false imprisonment is used "as a definitional building block for the statutes that address kidnapping and it aggravating factors."  White, 362 S.W.3d at 574.  As defined in the statute, false imprisonment is intended to "broadly address any situation where there is an interference with another's liberty."  Id. at 575.  In order to be convicted of false imprisonment—and by extension kidnapping—the statutes require that the defendant "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty."  Tenn. Code Ann. § 39-13-302(a); White, 362 S.W.3d at 576.  The statute does not require proof of any specific distance or period of time of the victim's confinement.  White, 362 S.W.3d at 576.

In State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), our supreme court noted that the broadly-drawn kidnapping statutes created a due process problem because they "could literally overrun several other crimes, notably robbery and rape . . . since detention and sometimes confinement, against the will of the victim, frequently accompany these crimes."  Anthony, 817 S.W.2d at 303 (quoting People v. Levy, 204 N.E.2d 842, 844 (N.Y. 1965)) (internal quotation marks omitted).  The Anthony court adopted a due process analysis which required reviewing courts to determine "whether the confinement, movement, or detention was essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction."  Id. at 306.

In a subsequent opinion, the supreme court refined the test for determining whether a separate kidnapping conviction may stand.  State v. Dixon, 957 S.W.2d 532, 535 (Tenn. 1997).  Citing Anthony, the Dixon court stated that the first inquiry in determining the validity of a separate kidnapping conviction is "whether the movement or confinement was beyond that necessary to consummate the [accompanying felony]."  Id.  "If so, the next inquiry is whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm."  Id.

In White, our supreme court held that, in cases where kidnapping is charged with another underlying offense, the General Assembly intended to punish kidnapping only in instances where the "removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." Id. at 577. Whether such confinement was sufficient to support a separate conviction for kidnapping was a question of fact for the jury to resolve after proper instruction. Id. Therefore, trial courts should specifically instruct the jury to determine "whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." Id. at 578. To that end, the supreme court developed a jury instruction to facilitate the jury's determination of whether the defendant's removal and confinement of the victim was sufficient to support a separate conviction for kidnapping. Id. at 580-81. Additionally, the supreme court expressly overruled Anthony and its progeny. White, 362 S.W.3d at 578.

In State v. Cecil, 409 S.W.3d 599 (Tenn. 2013), the supreme court clarified how the holding in White applied to cases that were in the "appellate pipeline"[6] when White was filed on March 9, 2012. Cecil, 409 S.W.3d at 608. The court held that, in the absence of a White instruction, appellate courts should review the case to determine if the error was harmless beyond a reasonable doubt. Id. at 610. By way of example, the court cited two cases to illustrate how the failure to give a White instruction may be harmless beyond a reasonable doubt, State v. Curtis Keller, No. W2012-00825-CCA-R3-CD, 2013 WL 3329032 (Tenn. Crim. App. June 27, 2013), perm. app. denied, (Tenn. Dec. 10, 2013), and State v. Jonathan Kyle Hulse, No. E2011-01291-CCA-R3-CD, 2013 WL 1136528 (Tenn. Crim. App. Mar. 19, 2013). See id. at 611.

In State v. Curtis Keller, the defendant, along with at least two accomplices, kicked in the door of a house and terrorized its occupants before removing the victims with the intention of using them as hostages in an attempt to rob a third party. Curtis Keller, 2013 WL 3329032, at *1, *4. We noted, "The evidence presented by the State fully established that the victims' kidnappings were separate from—not 'incidental' to—the commission of the aggravated assaults upon them." Id. at *4. Consequently, we held that, because no reasonable jury could have concluded that the victims' confinement was essentially incidental to the assaults upon them, any error created by the failure to give a White instruction was harmless beyond a reasonable doubt. Id. at *5.

---

[6] The court defined the "pipeline approach" as the application of "a new legal principle 'to litigants at bar, to all actions pending on the date of the decision announcing the change becomes final[,] and to all causes of action arising thereafter.'" Cecil, 409 S.W.3d at 608 (quoting Lease v. Tipton, 722 S.W.2d 379, 379 (Tenn. 1986)).

In State v. Jonathan Kyle Hulse, we held that the absence of a White instruction was harmless beyond a reasonable doubt when the defendant raped the victim and then chased her out of his home, grabbed her by the ankles, dragged her down, and struck her head on concrete. Jonathan Kyle Hulse, 2013 WL 1136528, at *5, *14. We reasoned that, at the time the defendant chased the victim, he had already completed the offense of aggravated rape. Id. at *14. The chase simply prevented the victim from summoning help and created a significant danger to her safety; it was not inherent to the rape. Id.

Similarly, in State v. Larry Jereller Altson, No. E2012-00431-SC-R11-CD, slip op. (Tenn. May 5, 2015), our supreme court held that the lack of a White instruction was harmless error beyond a reasonable doubt when the defendant was convicted of especially aggravated kidnapping and aggravated robbery. Larry Jereller Alston, No. E2012-00431-SC-R11-CD, No. E2012-00431-SC-R11-CD, slip op. at 14. In that case, the defendant and an accomplice approached the victim outside of her home and demanded her purse. Id. at 3. Then, the men forced the victim into her home and began to take items from the home. Id. The court reasoned that the aggravated robbery was completed when the defendant took possession of the victim's purse and before the victim was forced into and confined in her home. Id. at 13. Therefore, removal and confinement of the victim "were in addition to the initial robbery" as charged in the indictment. Id.

The supreme court's decision in White was released after the Defendant's trial but before he was sentenced or filed a motion for new trial. Consequently, the trial court understandably did not give the jury a White instruction. The Defendant correctly states that the trial court's failure to give the jury a White instruction constitutes error. See White, 362 S.W.3d at 78. Therefore, we review any error to determine if it was harmless beyond a reasonable doubt. See Cecil, 409 S.W.3d at 610.

In light of our previous ruling in Jonathan Kyle Hulse, Curtis Keller, and the supreme court's ruling Larry Jereller Alston, we conclude that any error created by the omission of a White instruction was harmless beyond a reasonable doubt as to the Defendant's convictions for the especially aggravated kidnapping and aggravated robbery of J.S. The facts show that the Defendant took possession of J.S.'s cell phone well before he confined J.S. in the bathroom. J.S. testified that the Defendant struck him on the head with his pistol as he exited his sister's bedroom, and J.S. fell to the ground, dropping his phone in the process. Additionally, testimony from the victims establish that the Defendant struck J.S., placed him in Kim's bedroom, and went to another part of the house. He then returned to escort Kim, Amanda, and J.S. into the bathroom. The recording of the 911 call indicates that the Defendant took possession of J.S.'s cell phone when he struck J.S. In the recording of the 911 call, one can hear the Defendant speaking with Ms. Melton in her bedroom, which was in a separate area of the house from where J.S. was struck. Further, one can hear the

Defendant forcing Kim into the bathroom as she begged for oxygen. Finally, the Defendant can be heard forcing J.S. and Amanda into the bathroom. The aggravated robbery of J.S. was completed when the Defendant took possession of J.S.'s cell phone. Therefore, the evidence clearly established that the removal and confinement of J.S. was not incidental to the aggravated robbery and the omission of the White instruction was harmless beyond a reasonable doubt as to the Defendant's dual convictions of especially aggravated kidnapping and aggravated robbery of J.S.

### b. Convictions for Especially Aggravated Kidnapping of L.S. and J.S. and Aggravated Robbery of Kim and Amanda

Second, we address whether the jury should have been given a White instruction when the Defendant was charged with especially aggravated kidnapping of L.S. and J.S. as well as the aggravated robbery of Kim and Amanda.[7] In the years following White, this Court has, on numerous occasions, addressed the issue of whether a White instruction is required when the Defendant is charged with kidnapping one victim (or multiple victims) and an accompanying felony against a separate victim. However, this Court has been unable to come to a consensus on the issue.

Although it was expressly overturned in White, see 362 S.W.3d at 578, both approaches rely heavily on Anthony in their analysis of this issue. In Anthony, the defendant and another man robbed a Shoney's Restaurant in Knoxville. Anthony, 817 S.W.2d at 301. As they approached the restaurant, the defendant and his accomplice stopped three Shoney's employees near a dumpster behind the restaurant, held them at gunpoint, and ordered them to lie on the ground. Id. The defendant left his accomplice with the three employees while he continued into the restaurant in search of money. Id. Once inside the restaurant, the defendant ordered the manager at gunpoint to take the defendant to the office. Id. En route to the office, they came across another Shoney's employee, Laurie Lexvold, and the defendant grabbed her and held the gun to her head, compelling her to accompany him to the office. Id. Once in the office, the defendant demanded that the safe be opened, but the manger informed him that the safe was in the front of the restaurant near the cash register. Id. The defendant ordered Ms. Lexvold to remain in the office while he and the manager returned to the safe. Id. The defendant retrieved what he wanted from the safe and made to leave the scene. Id. On his way through the building, the defendant happened upon yet another employee and ordered him into the restroom. Id.

---

[7] In Larry Jereller Alston, our supreme court ruled that the White instruction need not be given in cases where the kidnapping charge is accompanied by an aggravated burglary. Larry Jereller Alston, No. E2012-00431-SC-R11-CD, slip op. at 10. Therefore, the Defendant's conviction for aggravated burglary does not affect the analysis of this issue.

In applying the "essentially incidental" test to these facts, our supreme court held that the facts of Anthony would not support separate convictions for robbery and kidnapping. Id. at 307. Regarding the two employees detained inside the restaurant during the course of the robbery, the court held that their confinement was not "sufficiently significant in and of itself" to support a separate conviction. Id. (internal quotation marks omitted). Neither, the court found, could the detention of the three employees outside support separate kidnapping convictions. Id. As to these victims, the court stated,

> The test is not whether the detention was an 'integral part or essential element' of the robbery, but whether it was 'essentially incidental' to that offense. We conclude that the activity in question here was incidental. There is no significant difference between what happened to the employees who were inside the building and those who were not. The only distinguishing factor is their location at the time of the robbery. Indeed, had [the three employees] been standing inside the back door, rather than a few feet outside it, there would be no question that their detention was essentially incidental to the robbery.

Id.

Following Anthony but before White, this Court held that the aggravated kidnapping of one victim was not incidental to the aggravated robbery of another. State v. Richard Lacardo Elliott, No. M2001-01990-CCA-R3-CD, 2002 WL 31528538, at *4 (Tenn. Crim. App. Nov. 15, 2002), perm. app. denied, (Tenn. Feb. 24, 2003). In that case, the defendant entered a package store, ordered a customer already in the store to lie on the floor, and robbed the clerk behind the counter. Id. at *1. The defendant then led the customer and the clerk to a storage area in the back of the store, warned them not to move for five to ten minutes, and left the scene. Id. Ultimately, the defendant was charged with and convicted of aggravated kidnapping of the customer and aggravated robbery. Id. at *1. This Court distinguished Elliott from Anthony by reasoning that the defendant did not order the customer into the storage room until after the aggravated robbery of the clerk had been completed. Id. at *4. Therefore, the aggravated kidnapping was not incidental to the aggravated robbery. Id. Further, this Court held, "when the robbery victim and the kidnapping victim are two different persons, the issue is better characterized as a question of whether sufficient evidence exists to sustain a conviction for aggravated kidnapping." Id.

After our supreme court overruled Anthony and its progeny in White, this Court has adopted two different approaches to analyzing the validity of a defendant's convictions for kidnapping and an accompanying felony when the victims of the kidnapping were not victims of the accompanying felony. One approach reasons that a White instruction is required in

such cases because "[o]ur supreme court never said in the *Anthony/Dixon/White* line of cases that the fact the victim of the kidnapping was different than the named victim of the accompanying felony eliminated the need for due process analysis." State v. Josh L. Bowman, No. E2012-00923-CCA-R3-CD, 2013 WL 4680402, at *15 (Tenn. Crim. App. Aug. 29, 2013), perm. app. denied, (Tenn. Feb. 11, 2014). Although White overruled the methodology used to determine whether a kidnapping was essentially incidental to an accompanying offense, "it did not alter the rationale in Anthony regarding the circumstances in which the due process protection arises." State v. Jerome Maurice Teats, No. M2012-01232-CCA-R3-CD, 2014 WL 98650, at *31 (Tenn. Crim. App. Jan. 10, 2014) (Tipton, P.J., dissenting), perm. app. granted, (Tenn. May 15, 2014). Accordingly, those embracing this approach would hold that White is applicable to such cases. See State v. Gary S. Holman, No. E2012-01143-CCA-R3-CD, 2014 WL 295610, at *13 (Tenn. Crim. App. Jan. 27, 2014) (Ogle, J., concurring in part and dissenting in part), perm. app. filed, (Tenn. March 2, 2015) (concluding that White did not eliminate the need for a due process analysis when the victim of the kidnapping was different than the victim of the accompanying felony); Jerome Maurice Teats, 2014 WL 98650, at *30-32 (Tipton, P.J., dissenting) (noting that, under Anthony, such fact patterns would simply support a robbery conviction and concluding that "the supreme court altered in *White* how the question of whether a kidnapping is incidental to another felony is to be resolved, it did not alter the rationale in *Anthony* regarding the circumstances in which the due process protection arises"); State v. Ricco R. Williams, No.W2011-01897-CCA-RM-CD, 2014 WL 60967, at *12-16 (Tenn. Crim. App. Jan. 7, 2014) (Witt, J., concurring and dissenting), perm. app. granted, (Tenn. May 15, 2014) (concluding that "the [Anthony] due process bar to prosecuting the kidnapping charge did not depend upon the kidnapping victim's being a victim of the accompanying felony" and Anthony survives to the extent that it requires the use of due process principles in reviewing convictions of kidnapping when accompanied by another felony).[8]

Other members of this Court have concluded that White does not apply to situations where the defendant confines one victim while he commits an accompanying felony on a separate victim, reasoning:

> While we recognize that our supreme court has determined that it is unfair to convict a defendant of two crimes against a single victim when he arguably had committed only a single crime that, *by necessity*, includes an element of

---

[8] We note that our supreme court granted the parties' applications for appeal in Ricco R. Williams and Jerome Maurice Teats, and it appears that they will be addressing the issue of whether White applies when the victim of the kidnapping is not the same person as the victim of the accompanying felony. Order, State v. Ricco R. Williams, No. W2013-01897-SC-R11-CD (Tenn. May 15, 2014); Order, State v. Jerome Maurice Teats, No. M2012-01232-SC-R11-CD (Tenn. May 15, 2015).

a different crime, that same concern eludes us in the face of multiple victims for which a defendant is charged with a single offense. That is, we acknowledge that a perpetrator, by some means or other, must detain his robbery victim long enough to take some property from her. However, there is no corresponding *necessity* for the perpetrator to immobilize innocent bystanders. Certainly, immobilizing such persons may facilitate the perpetrator's commission of his intended crime against his intended robbery victim, but we do not agree that principles of due process prevent the perpetrator from being prosecuted for the separate crime he may commit against bystanders in order to facilitate his primary crime. Indeed, we fail to see how a crime against one person can be merely "incidental" to a crime against another person.

Ricco R. Williams, 2014 WL 60967, at *8 (emphasis in original). Therefore, because White expressly overruled Anthony and its progeny, a defendant can be convicted of both kidnapping and an accompanying felony when the kidnapping of one victim facilitates an accompanying felony against another victim. Id. The White instruction need only be given in cases where "the defendant committed dual offenses of kidnapping and an accompanying crime for which some measure of detention was necessary *against the same victim*." Id. (emphasis in original); see also Gary S. Holman, 2014 WL 295610, at *12 (noting that the White instruction appears "to have been drafted with the assumption that the defendant is being tried for dual offenses against a single victim"); Jerome Maurice Teats, 2014 WL 986650, at *21 (holding that the White instruction need only be given when the kidnapping and accompanying felony were committed against the same victim). In another case, one judge concluded that there is no "accompanying felony" when the defendant was charged with one offense against each victim, even though those offenses occurred "at virtually the same time." Josh L. Bowman, 2013 WL 4680402, at *16 (Woodall, J. dissenting) (noting that the especially aggravated kidnapping of one victim and especially aggravated robbery of another victim were distinct offenses and not "accompanying" felonies to each other).

We agree with the conclusion that White does not apply to cases where the defendant is charged with the kidnapping of one victim and an accompanying felony against another victim. Detaining one victim to facilitate a felony committed against another victim has criminal significance beyond the accompanying felony. Each victim is distinct from the other and suffered separate harm. Therefore, there is no due process concern and White does not apply. No error resulted from the failure to give the jury a White instruction for the especially aggravated kidnappings of J.S. and L.S.

*Failure to Merge Convictions*

Next, the Defendant argues that the convictions for especially aggravated kidnapping "should merge either with the aggravated robbery or possession of a firearm during the commission of a dangerous felony, or both." Additionally, the Defendant argues the prohibition against double jeopardy requires that his two convictions for employing a firearm during the commission of a dangerous felony and his conviction for possession of a firearm with the intent to go armed be merged with each other and with his aggravated robbery convictions. The State argues that the Defendant's double jeopardy rights were not violated in this case.

### a. Due Process

To the extent that the Defendant argues due process requires that his kidnapping convictions merge with his aggravated robbery and firearm convictions, it appears that the Defendant is simply restating his White argument. As we have already ruled that any White error in this case was harmless beyond a reasonable doubt, his argument as to the kidnapping charges is without merit.

### b. Double Jeopardy

The Defendant claims that his convictions for employing a firearm during the commission of a dangerous offense and possession of a firearm with the intent to go armed during the commission of a dangerous felony violate his double jeopardy rights. It is unclear from the Defendant's brief, but it appears that his claim is based on the contention that his firearm convictions and their respective underlying felony convictions arose from the same act or transaction and violate double jeopardy because "the evidence offered to prove [the underlying felony] charges . . . included the evidence necessary to prove the weapon[s] charge[s]." Anthony D. Byers v. State, No. W2011-00473-CCA-R3-PC, 2012 WL 938976, at *9 (Tenn. Crim. App. Mar. 15, 2012).[9]

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, states, "No

_____

[9] The Defendant does not articulate the basis for his double jeopardy argument but simply cites Anthony D. Byers to support of his claim. However, this Court never reached the merits of the petitioner's double jeopardy claim in that Anthony D. Byers because resolution of the issue was not "absolutely necessary to determining the issues in this case and adjudication of the rights of the parties." Anthony D. Byers, 2012 WL 938976, at *9. Thus, we must speculate as to the basis of the Defendant's claim based on the limited discussion of double jeopardy in Anthony D. Byers.

person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Similarly, the Tennessee Constitution guarantees "[t]hat no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Cost. art. I, § 10. Both clauses provide three distinct protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012).

With respect to the third category, the double jeopardy prohibition operates to prevent prosecutors and courts from imposing punishment that exceeds that authorized by the legislature. Id. at 542. Such single prosecution, multiple punishment claims ordinarily fall into one of two categories: (1) "unit-of-prosecution" or (2) "multiple description" claims. Id. at 543. Unit-of-prosecution claims arise when the defendant has been convicted of multiple violations of the same statute and asserts that the multiple convictions are for the same offense. Id. In contrast, multiple description claims arise in cases where the defendant had been convicted of multiple criminal offenses under different statutes but alleges that the statutes punish the same offense. Id. at 544.

When reviewing unit-of-prosecution claims, "courts must determine what the legislature intended to be a single unit of conduct for the purposes of a single conviction and punishment." Id. at 543 (citations and internal quotation marks omitted). Conversely, when reviewing multiple description cases, courts must determine whether the defendant committed two offenses or only one. Id. at 544. To do so, courts apply the test articulated in Blockburger v. United States, 284 U.S. 299 (1932). Blockburger, 284 U.S. at 304; Watkins, 362 S.W.3d at 544. Under Blockburger, if each offense includes an element that the other does not, then double jeopardy does not prohibit prosecution of both offenses even if there is "a substantial overlap in the proof offered to establish the crimes." Watkins, 362 S.W.3d at 544 (quoting Ianneli v. United States, 420 U.S. 770, 775 (1975)) (internal quotation marks omitted); see also Blockburger, 284 U.S. at 304. A Blockburger analysis requires two steps: (1) determine whether the statutory violations arose "from the same act or transaction" and (2) if they did arise from the same act or transaction, determine whether the offenses for which the Defendant was convicted constitute the same offense by comparing the elements of the offenses for which the defendant was convicted. Watkins, 362 S.W.3d at 545. If each offense contains an element that the other does not, the statutes are treated as distinct and courts presumed that the legislature intended that the offenses be punished separately. Id. at 545-46.

From the language in Anthony D. Breyer cited in the Defendant's brief, it appears that the Defendant is making a multiple description claim. Therefore, we will analyze the Defendant's convictions under the Blockburger test.

We believe the first prong of the Blockburger analysis had been met; the Defendant's firearms convictions arose out of the same act or transaction as his especially aggravated kidnapping and burglary convictions. Therefore, we will focus our analysis on the second prong of the Blockburger test—whether the statutory elements of the firearms convictions and underlying felony convictions constitute the same offense.

### i. The Especially Aggravated Kidnapping of L.S.

The Defendant was convicted of both the especially aggravated kidnapping of L.S. as well as possession of a firearm with the intent to go armed during the commission of the especially aggravated kidnapping of L.S. As charged in this case, especially aggravated kidnapping is defined as "false imprisonment . . . [w]here the victim was under the age of thirteen (13) at the time of the removal or confinement[.]" Tenn. Code Ann. § 39-13-305(a)(2) (2010). The trial court properly instructed the jury that the elements of the offense are: (1) that the Defendant knowingly removed or confined another unlawfully so as to interfere substantially with the other's liberty; and (2) that the alleged victim was under the age of 13 at the time of the removal or confinement.

In contrast, Tennessee Code Annotated section 39-17-1324(a) criminalizes the possession of a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony. The trial properly instructed the jury that the elements of that offense are: (1) that the Defendant possessed a firearm; and (2) that the possession was with the intent to go armed during the commission of or attempt to commit the especially aggravated kidnapping of L.S.

Both of these offenses contains an element that the other does not. Therefore, they are distinct offenses, and the Defendant is without relief as to his double jeopardy claim.

### ii. Especially Aggravated Kidnapping of J.S.

The Defendant was convicted of both the especially aggravated kidnapping of J.S. as well as employing a firearm during the commission of the especially aggravated kidnapping of J.S. The elements of especially aggravated kidnapping, as charged in this case, are the same as set out above for the especially aggravated kidnapping of L.S. The jury was properly instructed as to the elements of the offense.

Tennessee Code Annotated section 39-17-1324(b)(1) criminalizes employing a firearm during the commission of a dangerous felony. Further, especially aggravated kidnapping is listed in the statute as a dangerous felony. Tenn. Code Ann. § 39-17-1324(i)(1)(E) (2010). The trial court properly instructed the jury that the elements of the

offense are: (1) that the Defendant employed a firearm; (2) that the employment was during the commission of or attempt to commit the especially aggravated kidnapping of J.S.; and (3) that the Defendant acted either intentionally, knowingly, or recklessly.

Both of these offenses contains an element that the other does not. Therefore, they are distinct offenses, and the Defendant is without relief as to his double jeopardy claim.

### iii. Aggravated Burglary of Kim Schmitt

The Defendant was convicted of both the aggravated burglary of the habitation of Kim Schmitt and employing a firearm during the commission of the aggravated burglary of the habitation of Kim Schmitt. Aggravated burglary is defined as "burglary of a habitation." Tenn. Code Ann. § 39-14-403(a) (2010). The trial court properly instructed the jury that the elements of aggravated burglary are: (1) that the Defendant entered a habitation or any portion thereof; (2) that the Defendant entered with the intent to commit a theft; (3) that the Defendant acted without the effective consent of the owner; and (4) that the Defendant acted either intentionally, knowingly, or recklessly.

As noted above, it is a crime to employ a firearm during the commission of a dangerous felony. Tenn. Code Ann. § 39-17-1324(b)(1) (2010). Aggravated burglary is listed as a dangerous felony under the statute. Tenn. Code Ann. § 39-17-1324(i)(1)(H) (2010). The trial court properly instructed the jury that the elements of the offense are: (1) that the Defendant employed a firearm; and (2) that the employment was during the commission of or attempt to commit the aggravated burglary of the habitation of Kim Schmitt; and (3) that the Defendant acted either intentionally, knowingly, or recklessly.

Both of these offenses contain an element that the other does not. Therefore, they are distinct offenses, and the Defendant is without relief as to his double jeopardy claim.

### iv. Aggravated Robbery Convictions

To the extent that the Defendant contends that his firearm convictions should merge with each other and his convictions for aggravated robbery, the Defendant's argument fails. It is true that the Defendant was convicted of three counts of aggravated robbery accomplished with a deadly weapon. See Tenn. Code Ann. § 39-13-402(a)(1) (2010). However, aggravated robbery was not the underlying dangerous felony for any of the Defendant's firearm convictions. Therefore, the Defendant's convictions for aggravated robbery do not implicate double jeopardy concerns because the convictions did not arise from the same act or transaction as the firearm convictions. See Watkins, 362 S.W.3d at 545. Similarly, each of the Defendant's firearm conviction is paired with a different felony—the

especially aggravated kidnapping of L.S., the especially aggravated kidnapping of J.S., and the aggravated burglary of the habitation of Kim Schmitt. Therefore, individual firearm convictions arise out of different acts or transactions, and the Defendant's argument that the firearms convictions must merge with each other and the aggravated robbery convictions is without merit. See id.

*Introduction of Recorded Jailhouse Phone Calls*

The Defendant challenges the admission of the jailhouse phone calls between the Defendant and Mrs. Anderson on two grounds. First, he claims that the trial court erred when it refused to grant the Defendant a "reasonable continuance" to listen to the "680 unindexed and undated" jailhouse phone calls between the Defendant and his wife. Second, the Defendant argues that the jailhouse phone calls were not proper rebuttal evidence but, instead, should have been introduced during the State's case-in-chief. The State argues that the Defendant has waived the issue because he neither raised the issue of continuance nor objected to the introduction of the jailhouse phone calls as rebuttal evidence at trial. Further, the State argues that the Defendant is not entitled to plain error relief under either argument.

As a preliminary matter, we find that the Defendant has not waived either argument. When the State first brought the jailhouse phone calls to the attention of the trial court, defense counsel objected, commenting that she could not properly advise the Defendant about his right to testify on his own behalf without having listened to the jailhouse phone calls. The trial court granted an eighteen-hour continuance to allow the Defendant to listen to the phone calls. Although defense counsel did not renew her objection when she returned to court the next morning, we believe she had preserved the issue of continuance for appeal. As to the introduction of the jailhouse phone calls as rebuttal evidence, at trial defense counsel *explicitly* objected, arguing that the calls were not proper rebuttal evidence and that they should have been introduced during the State's case-in-chief. Further, the Defendant claimed that the trial court erred when it permitted the State to introduce the phone calls as evidence in his Motion for New Trial. Therefore, the issue is preserved for appeal.

### a. Failure to Grant a "Reasonable Continuance"

The Defendant argues that the trial court should have granted him a longer continuance to allow him to listen to the 680 jailhouse phone calls. The State gave the Defendant copies of the jailhouse phone calls along with a call log on the morning of the seventh day of a nine-day trial, during the Defendant's case-in-chief. The State argued that, should the Defendant testify, it should be able to impeach his testimony with statements he made in the jailhouse phone calls. Defense counsel argued that she could not properly advise her client about his right to testify without having the opportunity to listen to the phone calls.

Around 3:15 p.m., the trial court recessed until 9:00 a.m. the following morning to allow defense counsel the opportunity to listen to the phone calls. Consequently, defense counsel had approximately eighteen hours to listen to 680 phone calls.

The decision of whether to grant or deny a continuance is left to the sole discretion of the trial court and will not be disturbed on appeal absent a showing that the trial court abused its discretion. State v. Mann, 959 S.W.2d 503, 524 (Tenn. 1997); State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995); State v. Moorehead, 409 S.W.2d 357, 358 (Tenn. 1966). In order to show an abuse of discretion, the challenging party must show that "failure to grant a continuance denied [the] defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." Hines, 919 SW.2d at 579.

In this case, the Defendant has failed to demonstrate how he was prejudiced by the trial court's failure to grant a longer continuance. Defense counsel requested time to listen to the recordings so that she could properly advise the Defendant as to his right to testify. However, during the Momon hearing, the Defendant stated that he made the decision not to testify when the State rested its case-in-chief, days before any mention of the jailhouse phone calls. Therefore, we cannot say the trial court abused its discretion by failing to grant a longer continuance.

### b. Rebuttal Evidence

The Defendant argues that the jailhouse phone calls were not proper rebuttal evidence and that they should have been introduced during the State's case-in-chief. Admission or rejection of rebuttal evidence is left to sound discretion of the trial court. State v. Braden, 867 S.W.2d 750, 760 (Tenn. 1993). "Rebuttal evidence" is defined as "evidence 'which tends to explain or controvert evidence produced by an adverse party.'" Id. (quoting Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn. 1979), abrogated on other grounds by State v. Nesbit, 978 S.W.2d 872, 890 (Tenn. 1998)). As such, rebuttal evidence may only be introduced after the adverse party introduces the evidence to be rebutted because "[o]ne cannot rebut evidence that has not been advanced." Cozzolino, 584 S.W.2d at 768. "Any competent evidence which explains or is a direct reply to, or a contradiction of, material evidence introduced by the accused, or which is brought out on his cross-examination is admissible in rebuttal." Nease v. State, 592 S.W.2d 327, 331 (Tenn. 1979). Rebuttal evidence may be introduced to impeach a witness's testimony through the use of a prior inconsistent statement. Braden, 867 S.W.2d at 760.

In this case, the Defendant's recorded jailhouse phone calls constitute classic rebuttal evidence. The State introduced the phone calls in order to challenge Mrs. Anderson's

testimony about the Defendant's activities on the day of the home invasion. The jailhouse phone calls demonstrated that Mrs. Anderson and the Defendant had possibly coordinated their stories before she testified. Further, some of Mrs. Anderson's statements on the jailhouse phone calls, such as her description of what the Defendant was wearing, were inconsistent with her testimony at trial. Additionally, the Defendant does not explain what relevance the jailhouse phone calls would have had before Mrs. Anderson testified. Therefore, the trial court did not abuse its discretion in permitting the State to introduce the jailhouse phone calls as rebuttal evidence.

*Consecutive Sentencing*

Next, the Defendant argues that his crimes were not sufficiently aggravated to warrant consecutive sentencing. Additionally, the Defendant claims that the trial court improperly found that he was a "dangerous offender" and "double use[ed]" enhancement factors both to lengthen the Defendant's sentence and to justify consecutive sentencing. He asks that his sentence be reduced and ordered to run concurrently. The State argues that the trial court did not abuse its discretion when it imposed an effective sixty-year sentence. We agree with the State.

As a preliminary matter, we note that the trial court did not find the Defendant to be a "dangerous offender" for the purposes of imposing consecutive sentences. Instead, the trial court found that the Defendant was "an offender whose record of criminal activity is extensive" and that the Defendant was "sentenced for an offense committed while on probation." See Tenn. Code Ann. § 40-35-115(b)(2), (6) (2010). Therefore, to the extent that the Defendant contends that the trial court erred in determining he was a "dangerous offender," his argument is without merit.

When a defendant is convicted of multiple criminal offenses, the trial court may order the sentences to run consecutively if the court finds by a preponderance of the evidence that certain, enumerated factors apply to the defendant. Tenn. Code Ann. § 40-35-115(b) (2010). When a trial court supports its sentencing decision by placing its findings on the record, the applicable standard of review for the imposition of consecutive sentences is abuse of discretion with a presumption of reasonableness. State v. Pollard, 432 S.W.3d 851, 853 (Tenn. 2013). A finding of an abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. Id. at 554-55; State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978); State v. Delp, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The party appealing the sentence has the burden

of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

Because the record includes the trial court's findings, we will review this case under an abuse of discretion standard. Pollard, 432 S.W.3d at 853. In this case, the trial court explicitly found that the Defendant had an extensive record of criminal activity and that he committed the offenses for which he was convicted while he was on intensive probation for a Georgia forgery conviction. See Tenn. Code Ann. § 40-35-115(b)(2),(6) (2010). The evidence presented at the sentencing hearing supports such findings.

Additionally, pursuant to Tennessee law, the Defendant's convictions for employing a firearm during the commission of a dangerous felony were required to be served consecutive to their accompanying felonies—aggravated burglary and especially aggravated kidnapping. See Tenn. Code Ann. § 39-17-1324(e)(1) (2010). Therefore, we find that the trial court did not abuse its discretion when it ordered consecutive sentences.

Finally, this Court has held that "[t]here is no prohibition in the 1989 Sentencing Act against using the same facts and circumstances both to enhance sentences under applicable enhancement factors and to require those sentences to be served consecutively." State v. Meeks, 867 S.W.2d 361, 377 (Tenn. Crim. App. 1993). The trial court considered the proper factors both to enhance the Defendant's sentence and to impose consecutive sentences. It did not err by using similar facts to support each of the factors. Therefore, the Defendant's argument as to the double-use of enhancement factors is without merit.

*Cumulative Error*

Finally, the Defendant argues that the cumulative effect of the errors he raised necessitate reversal of his convictions and sentences. The cumulative error doctrine recognizes that multiple trial errors, while in insolation constitute harmless error, may have a cumulative effect that requires reversal in order to preserve the defendant's right to a fair trial. State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). However, in order to reverse a case under the cumulative error doctrine, "there must have been more than one actual error committed in the trial proceedings." Id. at 77. In this case, the Defendant has failed to demonstrate more than one actual error in the trial. Therefore, he is not entitled to relief under the cumulative error doctrine.

### III.  Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

-30-